AO 91 (Rev. 11/11) Criminal Complaint

AUSA: Nhan Ho Telephone: (313) 226-9100
Special Agent: Robert Holbrook Telephone: (313) 965-2323

# UNITED STATES DISTRICT COURT

for the

Eastern District of Michigan

Case: 2:26−mj−30559
Assigned To : Unassigned
Assign. Date : 9/11/2026
Description: RE: DI JIN (EOB)

United States of America
v.

Di JIN a/k/a Sophie JIN; a/k/a Xin SUI

Case No.

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of in or about July 2024 up to & includ. 09/08/26 in the county of Wayne and elsewhere in the Eastern District of Michigan, the defendant(s) violated:

| *Code Section* | *Offense Description* |
| --- | --- |
| 18 U.S.C. § 951(a) | Acting as an agent of a foreign government without notifying the Attorney General |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

*Complainant's signature*

Special Agent Robert Holbrook - FBI
*Printed name and title*

Sworn to before me and signed in my presence
and/or by reliable electronic means.

*Judge's signature*

Date: September 11, 2026

City and state: Detroit, Michigan

Honorable David R. Grand, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT AND ARREST WARRANT

I, Robert Holbrook, a Special Agent with the Federal Bureau of Investigation (FBI), being duly sworn, depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the FBI and have been since 2019. I have received Basic Field training at the FBI Academy in Quantico, Virginia, as well as additional training and courses in counterintelligence investigations and operations. I am currently assigned to the FBI's Counterintelligence Division, Detroit Field Office. The FBI's Counterintelligence Division is responsible for exposing, preventing, and investigating ongoing national security threats from foreign intelligence services and other intelligence activities within the United States.

2. I make this affidavit in support of an application for a criminal complaint and arrest warrant charging Di JIN (AKA Sophie JIN; AKA Xin SUI; DOB XX/XX/1985) with acting as an agent of a foreign government without notifying the Attorney General, in violation of 18 U.S.C. § 951(a). Specifically, from at least in or about July 2024 up to and including on or about September 8, 2026, in the Eastern District of Michigan and elsewhere within the Unites States, JIN acted under the direction and control of the Government of the People's Republic of China ("PRC").

3. The facts contained in this affidavit come from my personal observations, my training and experience, my review of documents and statements,

and information obtained from other law enforcement officers and/or individuals with knowledge of this matter. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and does not set forth all my knowledge regarding this matter.

## PROBABLE CAUSE

### 18 U.S.C. § 951

4. Title 18, United States Code, Section 951 provides that "[w]hoever, other than a diplomatic or consular officer or attaché, acts in the United States as an agent of a foreign government without prior notification to the Attorney General if required," shall be punished. With several exceptions not applicable here, Section 951 defines the term "agent of a foreign government" as "an individual who agrees to operate within the United States subject to the direction or control of a foreign government or official." 18 U.S.C. § 951(d).

### Background Concerning the PRC Intelligence Services

5. The People's Republic of China Intelligence Services ("PRCIS") encompass both civilian and military components of Chinese intelligence programs. Civilian intelligence collection is handled by the Ministry of State Security ("MSS"). The MSS can be described as an institution similar to the FBI and the Central Intelligence Agency ("CIA"), combined under one intelligence directorate responsible for counterintelligence, foreign intelligence, and political security.

6. Among other things, the PRCIS are focused on identifying and influencing the foreign policy of other countries, including the United States, and obtaining sensitive and confidential information from those countries. The PRCIS seeks to obtain information on foreign intelligence operations directed at the PRC; corporate and industrial information that could benefit the PRC; biographical profiles of foreign politicians and intelligence officers; and the political, economic, and security policies of other countries that might affect the PRC.

7. Additionally, the PRCIS are tasked with conducting clandestine and overt human source operations, of which the United States is a principal target. Human sources or assets are people who agree to help a foreign intelligence service by providing information to that service in response to taskings from foreign intelligence officers or agents. PRCIS human source operations use PRCIS trained intelligence officers, as well as non-professional collectors called “cut-outs” or “co-optees,” to recruit, operate, and obtain information from human sources. Cut-outs or co-optees can operate under a variety of covers, posing as diplomats, journalists, academics, or businesspeople both at home and abroad. These individuals are tasked with spotting, assessing, targeting, collecting, and handling sources or assets with access to classified, open-source, proprietary, or sensitive information that the PRC government can use for economic, political, or military decision-making or advantage.

8. The PRCIS source operations tend to originate inside the PRC, where the PRCIS prefers to meet with its sources or assets. To facilitate continued meetings inside the PRC, the PRCIS will arrange and/or pay for travel and expenses. The PRCIS is known to pay their sources not only in cash, but also through other means, including business considerations or other types of assistance.

**JIN's Background and Travel History**

9. JIN is a citizen of the PRC, who resides in Tianjin Municipality in northern China.

10. On August 2, 2012, JIN was issued a F-1 nonimmigrant student visa, which expired on July 31, 2013. After her F-1 visa expired, between 2013 to 2026, JIN entered the United States on B1/B2 temporary visitor visas on at least seven separate occasions:

| **Date entering U.S.** | **Departure location (into U.S)** | **Arrival location (into U.S)** | **Date leaving U.S.** | **Departure location (out of U.S)** | **Arrival location (out of U.S)** |
|---|---|---|---|---|---|
| Sept. 19, 2022 | Istanbul Airport (Istanbul, Turkey) | San Francisco International Airport (San Francisco, California) | Mar. 17, 2023 | John F. Kennedy International Airport (New York, New York) | Incheon International Airport (Seoul, South Korea) |
| Feb. 6, 2024 | Chengdu Tianfu International Airport (Chengdu, China) | Los Angeles International Airport (Los Angeles, California) | Feb. 14, 2024 | San Francisco International Airport (San Francisco, California) | Beijing Capital International Airport (Beijing, China) |

| | | | | | |
|---|---|---|---|---|---|
| Jul. 5, 2024 | Hong Kong International Airport (Hong Kong) | Los Angeles International Airport (Los Angeles, California) | Jul. 14, 2024 | Washington Dulles International Airport (Washington, D.C.) | Abu Dhabi International Airport (Abu Dhabi, United Arab Emirates) |
| Jun. 17, 2025 | Beijing Capital International Airport (Beijing, China) | Washington Dulles International Airport (Washington, D.C.) | Jun. 26, 2025 | Los Angeles International Airport (Los Angeles, California) | Shanghai Pudong International Airport (Shanghai, China) |
| Jul. 22, 2025 | Beijing Capital International Airport (Beijing, China) | San Francisco International Airport (San Francisco, California) | Jul. 25, 2026 | San Francisco International Airport (San Francisco, California) | Incheon International Airport (Seoul, South Korea) |
| Mar. 4, 2026 | Shanghai Pudong International Airport (Shanghai, China) | Los Angeles International Airport (Los Angeles, California) | Mar. 12, 2026 | Washington Dulles International Airport (Washington, D.C.) | Incheon International Airport (Seoul, South Korea) |

11. On April 26, 2025, JIN submitted an application for a B-1/B-2 visitor visa, which was issued on May 7, 2025. In this application JIN identified herself as a "General Manager" of "Tianjin Smart City Technology Co, Ltd" in Tianjin, PRC,[1] reported an employment date of March 16, 2018, and listed her monthly income in

[1] According to Tianjin Smart technology website, "Tianjin Smart technology came into being in 2019!" *See Company Profile* (under About), Tianjin Smart Technology, https://en.tianjinsmart.com/about.html (accessed Sept. 10, 2026).

local currency (presumably Chinese Yuan) as 20,000 (approximately $2,900). In response to the question, “Have you ever been refused a U.S. visa, refused admission to the United States, or withdrawn your application for admission at a port of entry?” JIN answered “NO.” On her prior visa application submitted on June 23, 2015, however, she answered “YES” to the same question and provided the explanation, “I DON’T KNOW.” In response to the question, “Do you seek to engage in espionage, sabotage, export control violations, or any other illegal activity while in the United States?” JIN answered, “NO.”

**CBP Inspection on September 8, 2026**

12. On September 8, 2026, JIN attempted to enter the United States at Detroit Metropolitan Airport (DTW) (Delta Flight 388 from Shanghai Pudong International Airport (PVG)). Upon arrival, JIN stated to U.S. Customs and Border Protection (CBP) officers that she intended to visit an 81-year-old friend in Washington, D.C., for 11 days. CBP subsequently referred JIN to secondary inspection to verify the purpose of her travel.

13. During the secondary inspection, CBP officers found a business card for JIN’s 81-year-old friend, which identified the individual as a U.S. Government Official (“Government Contact 1”). Further investigation indicated that Government Official 1 may now be retired from that government position. CBP officers telephonically contacted Government Contact 1 to verify JIN’s stated purpose of

travel. Government Contact 1 told CBP officers that he was unaware of JIN's travel to the United States, but if JIN was in town, he would potentially have dinner with her. However, Government Contact 1 also indicated that he believed JIN may potentially be an "informer" to the PRC Government.

14. During the secondary inspection, CBP officers interviewed JIN. I have reviewed a recording of that interview, and I found her responses were disorganized, and she often failed to directly answer the officers' questions. She described owning two non-profitable companies in Tianjin and funding her operations through "introduction fees" connecting politicians and officials to businesses. She described past studies in communications and advertising, time in the U.S. on a F-1 visa in 2013, pilot training she never completed, and participation in a national security program at Harvard Kennedy School in 2016, where she said she met influential individuals.

15. She said she met Government Contact 1 in Washington, D.C. on previous trips and her purpose for travel was to meet Government Contact 1 once or twice and take photos "on the street." CBP confronted JIN with an April 2026 message she sent to Government Contact 1 in which she indicated that "Xi's team just came to [her]" about topics such as procurement, rare earth metals, U.S. Treasury bonds, and trade mechanisms, and tariff exemption for billions of non-sensitive goods.

16. JIN then admitted that a "think tank," which she believed to be tied to the PRC government, asked her to travel to Washington, D.C., to gather unspecified

information. She said she had reported previous U.S. trips to this "think tank" through a Chinese contact who used a fake name and told her to delete their messages before travel, which she did a few days before this trip.

**FBI Interviews JIN on September 8, 2026**

17. Following the secondary inspection, FBI Agents conducted two interviews of JIN. Many of her responses to questions continued to be disorganized, evasive, and unresponsive. However, JIN ultimately admitted that she had conducted intelligence gathering work in the United States on behalf of PRC intelligence officials who, in turn, allegedly assisted her with her business interests in China.

18. JIN told agents that she had been approached by local intelligence officials in the MSS's Tianjin Bureau (formally the Tianjin State Security Bureau, hereinafter "Tianjin Bureau") as early as 2012 because of her alleged connections to Airbus. Around that time, she had been a participant in a pilot training program in Los Angeles. JIN stated that MSS intelligence officers directed her to obtain information from a specific event in the United States and to provide the information to the MSS when she returned to the PRC.

19. JIN told agents that in February 2024, she was connected with intelligence officers in Shanghai ("Shanghai Intelligence Officers") who were interested in working with her due to her "networks [in] several countries." She traveled to the United States that year at their request, telling the Shanghai

Intelligence Officers that she would meet with Government Contact 1, Government Contact 2, and two former U.S. government officials ("Government Contact 3" and "Government Contact 4"). The full names along with current or former government positions of these individuals are known to law enforcement. Prior to her departure from the PRC, JIN stated she met with Shanghai Intelligence Officers in Shanghai and received directions to obtain information related to Chinese and U.S. relations from her four contacts. According to JIN, she ultimately only met with Government Contact 1 and Government Contact 2 and reported back to the Shanghai Intelligence Officers regarding information learned upon her return.

20. JIN stated the Shanghai Intelligence Officers provided her a cover story if she was questioned while in the United States. They instructed her to state she worked with a "think tank" in Beijing.

21. JIN possessed three cellular telephones when she attempted to enter the United States on September 8, 2026. JIN later signed a written consent to search all three cellular telephones. Communications between JIN and both Government Contact 1 and Government Contact 2 were located on one or more of her cellular devices.

22. For example, on or about July 6, 2024 (one day after JIN's traveled to the United States from Hong Kong International Airport), Government Contact 1 sent JIN a text message. The message stated:

> Don't think you should come now – altho [sic.] it would be great to see you. It may not be safe for me. How many players are in

> this game? I believe you are what you say – a business woman, not intel agent. How can we be sure you aren't being tracked, not only by Chinese Intelligence. This could bring me under security scrutiny. I don't want to do anything that could raise doubts & give appearance of being disloyal to my oath & to the US. They could think my seeing you means I may be providing information to you. We know that's nit [sic.] true, that our relationship is personal & good. But I don't want to explain it to security. I believe you are not an intel agent per se. But as a Chinese business person you have to work with Chinese Military Intel – normal course of business in China. Let's give it a little time. I want to find out more about how much surveillance you might be under from our side, if any, because you are being tracked & reporting back to Chinese Intel.

23. In response, JIN wrote: "Understand! I will see friend in DC. You can come out if you want. I don't want to bring you any risk… fully understand." Government Contact 1 then messaged JIN that if she was going to be in Washington, D.C., then they should meet.

24. JIN told agents that she returned to the United States in June 2025. Before her trip, she again told the Shanghai Intelligence Officers that she would meet with Government Contact 1, Government Contact 2, Government Contact 3, and Government Contact 4. She again received directions to obtain information related to Chinese and U.S. relations from her four contacts. She again indicated that she ultimately met with Government Contact 1 and Government Contact 2 and again reported regarding information she learned after her return.

25. JIN told agents that she returned to the United States to once again engage in intelligence gathering in March 2026. According to JIN, she only met with Government Contact 1 on this trip.

26. Although JIN claimed that the purpose of her most recent trip, on September 8, 2026, to the United States was to again meet with Government Contact 1, JIN denied that this trip was at the behest of the Shanghai Intelligence Officers. However, JIN's earlier statements to FBI agents were inconsistent with this denial. JIN stated at the time of this trip, her contact at the "think tank" (which she later admitted was a cover for Shanghai Intelligence Officers) contacted her by phone prior to her departure from the PRC. JIN stated they had planned an in-person meeting that was canceled at the last minute. JIN stated that the "think tank" individuals again asked her to provide any information she obtained from Washington, D.C.

**Department of Justice Database Checks.**

27. According to Department of Justice database checks on September 10, 2026, neither Di JIN, Sophie JIN, or Xin SUI has ever registered under FARA or notified the U.S. Attorney General under 18 U.S.C. § 951 as an agent of the PRC.[2]

---

[2] Pursuant to 28 C.F.R. § 73.3(b) and (c), foreign agents engaged in certain law enforcement or judicial activities may make their Section 951 notifications to Interpol, an FBI Legal Attaché, or the Department of Justice's Office of International

## CONCLUSION

28. Based on the foregoing, I submit that there is probable cause to believe that from at least in or July 2024 up to and including on or about September 8, 2026, in the Eastern District of Michigan and elsewhere, JIN acted within the United States under the direction and control of the Government of the People's Republic of China, without prior notification to the Attorney General, as required by law, in violation of 18 U.S.C. § 951(a).

Respectfully submitted,

Robert Holbrook, Special Agent
Federal Bureau of Investigation

Sworn to before me and signed in my
presence and/or by reliable electronic means.:

HONORABLE DAVID R. GRAND
UNITED STATES MAGISTRATE JUDGE

Date: September 11, 2026

---

Affairs. Based on this investigation, JIN does not fall into the categories of foreign agents who would make such notifications to these entities.